IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SUSAN J., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:00-cv-918-MEF |
| | ) | |
| BOB RILEY, in his official capacity as | ) | (WO–Publish) |
| Governor of the State of Alabama, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Eleven named plaintiffs seek to represent a class of disabled persons. The Defendants

are Bob Riley, as Governor of the State of Alabama, John Houston, as Commissioner of

Mental Health and Mental Retardation, and The Alabama Department of Mental Health and

Mental Retardation. Plaintiffs challenge the way Defendants operate a Medicaid program

known as the Home and Community Based Waiver Program ("HCB Waiver"). Specifically,

they allege Defendants have: (1) violated the Medicaid Act by failing to provide services to

eligible individuals with "reasonable promptness;" (2) violated the Medicaid Act by failing

to provide "comparable" services to participants in the Waiver program; (3) violated the

Medicaid Act by failing to provide an application process that meets the requirements of the

Act; and (4) violated Plaintiffs Fourteenth Amendment substantive due process rights.

There are currently six motions under submission: Plaintiffs' Amended Motion for

Class Certification (Doc. # 128), four Motions for Summary Judgment (Doc. ## 127, 152,

172, 211), and Plaintiffs' Motion for Reconsideration (Doc. # 218). The issues raised in the

Motions for Summary Judgment partially overlap the issues raised in the Motion for Class

Certification. The Motion for Reconsideration raises distinct issues. Because the Parties and

the Court expect an interlocutory appeal of the class certification decision pursuant to Rule

23(f),[1] the Court in this Opinion and Order decides only the Motion for Class Certification.[2]

For the reasons set forth in this Memorandum Opinion and Order, the Motion is due to be

GRANTED in part and DENIED in part. It is due to be granted with respect to Subclasses

Two and Three and due to be denied with respect to Subclass One.

## II. JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs

bring their claims pursuant to 42 U.S.C. § 1396 *et seq.*, § 1983, and the Due Process Clause

of the Fourteenth Amendment. The parties do not contest venue and personal jurisdiction,

and the Court finds a sufficient basis for each.

## III. FACTS AND PROCEDURAL BACKGROUND

### A. Overview of the Parties and Claims

---

[1]This Motion for Class Certification raises issues that the Eleventh Circuit has not yet decided.

[2]Interlocutory appeals from class certification decisions do not automatically stay proceedings in the District Court. Fed. R. Civ. P. 26(f). The Court intends to rule on the other motions currently under submission and, if the Eleventh Circuit exercises its discretion to entertain the interlocutory appeal, stay the proceedings. If the parties decline to appeal or if the Circuit declines to hear the appeal, trial will go forward as scheduled.

Named Plaintiffs seek to represent a group of adults with mental retardation who are unable to care fully for themselves and require varying degrees of care and treatment. The Defendants are Bob Riley, in his official capacity as Governor of the State of Alabama, the Alabama Department of Mental Health and Mental Retardation (the "Department"), and John M. Houston ("Houston"), in his official capacity as Commissioner of the Department.

Plaintiffs claim that the "State of Alabama, in violation of its obligations under federal and state law, has continually failed to provide necessary Medicaid services in a timely or 'reasonably prompt' manner as required by federal law." (Doc. # 128 2.) Plaintiffs seek declaratory and injunctive relief.

### B. Proposed Class Definition

Plaintiffs seek certification of the following three subclasses:[3]

Subclass One:   All persons with mental retardation who have applied for services compensable under Alabama's Home and Community Based Waiver Programs and who have been determined to be eligible for services but who have not received them with reasonable promptness or have received inadequate or inappropriate services.

Subclass Two:   All persons with mental retardation who have applied for services compensable under Alabama's Home and Community Based Waiver Programs but who have been adjudged ineligible and/or denied services without notice and opportunity for hearing.

Subclass Three:   All persons with mental retardation who have applied for services compensable under Alabama's Home and Community

---

[3]These three subclasses track very closely the three subclasses offered in dicta by the Eleventh Circuit in *Prado v. Bush*, 221 F.3d 1266, 1282 (11th Cir. 2000).

Based Waiver Programs and have not received a reasonably prompt claims determination.

(Doc. # 128 1-2.)

### C. Overview of the Medicaid Waiver Program

Medicaid is a joint federal and state program under Title XIX of the Social Security Act.  42 U.S.C. § 1396 *et seq.*  The federal government reimburses a portion of the expenditures incurred by states that elect to furnish medical assistance to individuals with mental retardation.  States that elect to participate in the program must submit a plan to the U.S. Department of Health and Human Services that details the programs and funding requirements for which Medicaid funds will be used.  Alabama has elected to participate in the program and has submitted a state plan.

State plans must provide certain specified health care services, such as inpatient hospital services, certain outpatient services, and physicians' services.  In addition to the mandatory services, a state may also elect to provide optional services such as residential placements.  The HCB Waiver programs are optional services.

States that elect to provide optional services must provide them to all eligible persons in the state.  *Id.* § 1396a(a)(8).  The services must also be "furnished with reasonable promptness." *Id.*  Eligible recipients generally must receive services that are comparable in amount, duration, and scope to those services received by other eligible recipients.  *Id.* § 1396a(a)(10).  The Medicaid Act does, however, allow states to waive the comparability requirements.  *Id.* § 1396n(c)(3).  Alabama has waived the comparability requirements.

4

### D. Organization of Alabama's Medicaid Waiver Programs[4]

The Department develops and manages services through three clinical divisions: Mental Health, Mental Retardation Services, and Substance Abuse. (Doc. # 105-2 ¶ 2.) The Division of Mental Retardation Services (the "Division") oversees the payment and day-to-day management of the Medicaid programs that are at issue in this case. (*Id.* ¶ 2.) The Division has a central office and five regional offices. (*Id.* ¶ 6.) The central office works with the Alabama Medicaid Agency to "write, amend, and renew the Waiver Programs, resolve problems, and administer the quality assurance processes required by the Medicaid Agency. In addition, the central office develops systems, policies and procedures, oversees contracts, develops and presents the budget, and sets directions and goals for the community based system in concert with input from a standing group of stakeholders . . . ." (*Id.* ¶ 6.)

The Division's central and regional offices generally do not directly provide services, but rather contract for services with private vendors. (*Id.* ¶ 4.) There are "limited exceptions," such as crisis situations, where the regional offices provide services directly. (*Id.* ¶ 7.) The vendors provide several services including "case management; residential and day habilitation; supported and pre-vocational employment; respite in and out of home;

---

[4] The factual summaries in the parties' briefs referred to the detailed affidavits of Fordyce Mitchel, the Director of Mental Retardation Community Programs in the Department's Division of Mental Retardation Services (Doc. # 105-2), and Eranell McIntosh-Wilson, the Special Advisor to Houston (Doc. # 129-2). The Court will cite to these affidavits throughout this Section.

personal and companion care in any setting; physical, occupational, speech and behavior therapy; nursing care; environment adaptation; specialized equipment; person-centered plan facilitation and crisis intervention."  (*Id.* ¶ 4.)

Persons with mental retardation can apply for waiver services by contacting their county's "310 Board," which is public nongovernmental agency that serves as an access point to the state's waiver programs.  (*Id.* ¶ 8-9.)  The 310 Boards take their name from the legislation that created them, namely Acts 1967, No. 310, which is codified as amended at Alabama Code § 22-51-1 *et seq.*  There are two types of 310 Boards: (1) Comprehensive 310 Boards, which "tend to provide all services directly"; and (2) Mental Retardation Specialty 310 Boards, which "provide only case management services or, if they provide other services, they do so through subcontracting with other provider entities."  (*Id.*)

### E. Alabama's Home and Community Based Waiver Programs

Plaintiffs seek to compel Defendants to provide services to them under Alabama's HCB Waiver programs.  Alabama has two HCB Waiver programs, the Mental Retardation ("MR") Waiver and the Living at Home ("LAH") Waiver.

The term "waiver" comes from Section 1915(c) of the Social Security Act, enacted in 1981, which gave the Secretary of the Department of Health and Human Services the power to waive certain requirements of the Medicaid Act.  Section 42 U.S.C. § 1396n(c)(1) provides in pertinent part:

> The Secretary may by waiver provide that a State plan approved under this subchapter may include as "medical assistance" under such plan payment for

6

> part or all of the cost of home or community-based services (other than room
> and board) approved by the Secretary which are provided pursuant to a written
> plan of care to individuals with respect to whom there has been a
> determination that but for the provision of such services the individuals would
> require the level of care provided in a hospital or a nursing facility or
> intermediate care facility for the mentally retarded the cost of which could be
> reimbursed under the State plan.

42 U.S.C. § 1396n(c)(1); *see also* 42 C.F.R. § 441.300 ("Section 1915(c) of the Act permits States to offer, under a waiver of statutory requirements, an array of home and community-based services that an individual needs to avoid institutionalization."). An important requirement relevant to the claims in this case is that "all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8).

### 1. MR Waiver Program

Alabama began its MR Waiver program in 1981. (Doc. # 105-2 ¶¶ 27, 31.) The program offers twenty-three services. Day habilitation and residential habilitation are the primary ones. (*Id.* ¶ 31.) Day habilitation programs offer assistance and training "in daily living activities and instruction in the skills necessary for independent pursuit of leisure time/recreation activities." Medicaid HCBS MR Waiver Service Catalog (Doc. # 189-4, Ex. 3, at 110.) "A unit of service is a day consisting of at least 5 hours, one hour of which may include transporting the individual." (*Id.*) Residential habilitation programs "provide care, supervision, and skills training in activities of daily living, home management and

community integration." (*Id.* at 107.) These services may be provided in the waiver recipient's home or a community setting. In either case, the recipient's home or community setting must satisfy certain requirements and obtain certification from the Department. (*Id.*) For instance, a newly certified home may have no more than six residents. (*Id.*)

## 2. LAH Waiver Program

Alabama began its LAH Waiver program in 2002. (Doc. # 105-2 ¶ 33.) "It is a 'supports waiver' which takes advantage of a [federal] rule that allows the state to set a cap on the total amount that can be expended for any one individual, and allows the state to set that cap lower than the average cost of the offsetting type of institution. The concept is that a supports waiver can provide sufficient services to help a family support their member with a disability for many years, before that person will need residential services. So the person receiving services through this waiver can remain on the waiting list for services from the MR Waiver, while benefitting from supports in the home and in the community." (*Id.*)

The services in the LAH Waiver match those in the MR Waiver except for residential habilitation out of the person's home. (*Id.* ¶ 33.) "The current cap in the LAH Waiver is $22,500, and is made effective by not enrolling anyone in this waiver whose costs can reasonably be expected to exceed that cap within a year. If someone were to reach the point of exceeding the cap, [he or she] could receive crisis intervention services at costs beyond the cap (this is a provision of this waiver), until the [Department] could transfer [him or her] to the MR Waiver." (*Id.*)

### 3. Number of Slots in the Waiver Programs

A state's HCB Waiver requires the approval of the Centers for Medicaid and Medicare Services ("CMS") Administration.  (Doc. # 105-2, ¶ 28.)  A state plan must specify the maximum number of people who will receive waiver services in the applicable year.  When approved by CMS, this number is a "cap" on how many persons can participate in the state's waiver program.  (*Id.*)  If a person leaves the waiver program (for example, because he or she passed away or moved out of the state), then his or her slot is not used again until the following year.  (*Id.*)  In Alabama, the applicable year for the MR Waiver and LAH Waiver runs from October 1 through the following September 30.  (*Id.*)

Alabama's MR Waiver program currently has 5,260 slots.  The Department requested and obtained approval for increases in late 2000 (4,200 to 5,200) and April 2007 (5,200 to 5,260).  (*Id.* ¶ 30.)  Alabama's LAH Waiver program currently has 569 slots.  The Department requested and received approval for increases in 2003 (204 to 326), 2004 (326 to 449), and 2005 (449 to 569).  (Doc. # 129-2 ¶ 3.)

### F. The Waiting List

The Division maintains a waiting list for both the MR and LAH waivers.  (Doc. # 105-2 ¶ 34.)  The Division ranks people according to their needs and criticality by taking into account each person's individual needs and abilities.  (*Id.* ¶¶ 16-21.)

Prior to 2003, Alabama did not have a "coherent centralized electronic waiting list." (*Id.* ¶ 16.)  The previous system contained data on persons needing services, "but the data

was not edited [or] standardized and there was insufficient information to create a ranking or prioritization of need." (*Id.*)

The new system works as follows: Persons who need services must contact their county's 310 Board. (Doc. # 129-2 ¶ 20.) The 310 Board case managers and intake coordinators complete documentation, including a "Criticality Summary," in order to document the person's eligibility for the waiver program. The 310 Board sends the documentation to one of the state's five regional offices. If the regional office approves the application, it adds the person to the waiting list. (*Id.*) The waiting list includes all persons in the state who are deemed to meet the requirements for participation in the Waiver programs.

The waiting list "is a planning tool that the Department has developed to assist it in its mission to plan for and to serve individuals with mental retardation throughout the State. The waiting list helps the Department understand the needs of individuals now and in the future, based upon the categories of the services that they have requested and are expected to be eligible for, all prioritized by the criticality of their need." (Doc. # 129-2 ¶ 7.)

The criticality score is a number ranging from 1 (no present need for services) to 12 (immediate need). The Division assigns a score to each service requested by each individual on the waiting list. (*Id.* ¶ 10.) A person's criticality scores will not change unless his or her circumstances change. Fordyce Mitchel, the Director of Mental Retardation Community Programs in the Department's Division of Mental Retardation Services, provided the

following example of how a criticality score could change:

> [A]n individual under the age of 21 who is eligible to attend public school may be on the waiting list for day habilitation for long range planning purposes, with a low criticality score because he is attending public school. When that individual ages out of the public school system, however, his need has changed drastically and his criticality score will very likely jump, placing him ahead of others on the list.

(*Id.* ¶ 11.)

The process of enrolling a person in a waiver program begins when the regional office offers a slot in a waiver program to a person on the waiting list. For example, a regional office might offer the MR Waiver to persons with a high criticality scores who are waiting for residential services because only the MR Waiver reimburses residential habilitation out of the person's home. On the other hand, the regional office might offer the LAH Waiver to persons who do not need residential habilitation or need it with low criticality. (*Id.*)

After the person accepts the offered waiver slot, the regional office contacts the 310 Board to develop a plan of care, lets the person choose the provider(s) of services, prepares the documentation that is required to enroll the person, and contacts the service provider to initiate the plan of care. (Doc. # 105-2 ¶ 11.)

The size of the waiting list has increased in recent years. In August 2005, there were approximately 1,311 persons on the waiting list, according to Patricia J. Martin, Associate Commissioner for MR Services, Alabama Department of Mental Health and Mental Retardation. Coordinating Subcommittee for Mental Retardation Services, Meeting Summary, August 7, 2007 (Doc. # 128-3, PX 1, 3.) On April 12, 2007, there were 1,522

11

persons were on the waiting list, according to Defendants.  Response of Defendants to

Plaintiffs' First Set of Interrogatories (Doc. # 128-4, PX 2, Response No. 1.)  In August

2007, there were 1,681 persons on the waiting list, according to Martin.  (Doc. # 128-3, PX

1, at 3.)  Since July 1, 2000, over 2,700 persons have submitted applications.  (Doc. # 128-4,

PX 2, Response No. 1.)

### J. Subclass Representatives

Plaintiffs argue that Tara L.'s claims are typical of Subclass One, Beverly W.'s claims

are typical of Subclass Two, and Krystal W.'s claims are typical of Subclass Three.

### 1. Subclass One:  Persons Who Have Not Received Waiver Services With Reasonable Promptness

Plaintiffs offer Tara L. as a representative of Subclass One.  She is a twenty-eight year

old resident of Jefferson County and has been diagnosed with mental retardation, autism,

psychosis, and aggressive behavior.  Affidavit of Belinda L. (Doc. # 121-4 ¶ 3) (filed under

seal pursuant to an Order of this Court (Doc. # 118)).  On December 4, 1997, Belinda L.,

Tara's mother, applied for residential, day, and support services through the local 310 Board,

the Mental Retardation & Developmental Disabilities Health Care Authority of Jefferson

County, Inc. ("Jefferson County 310 Board").  (*Id.* ¶ 5); (Doc. # 129-2 ¶ 30.)  Tara has never

been offered services other than case management.  (*Id.* ¶ 10.)  Belinda was informed that

Tara has not been offered a residential placement because of her behavior problems.  (*Id.* ¶

10.)

As of July 2005, Tara was on the statewide waiting list for residential and day

12

habilitation services.  Letter from Frederick Pinto to Belinda L. (Doc. # 173-45, Ex. N, at 118.)  As of September 24, 2007, Tara was ranked 514.  (*Id.* ¶ 11); (Doc. # 129-2, ¶ 30).  Belinda believes that Tara needs and would benefit from these services.  (Doc. # 121-4, ¶ 14.)  With respect to residential habilitation services, Tara has a criticality score of 1.  With respect to day habilitation services, she has a criticality score of 4.  (Doc. # 129-2, ¶ 30.)

## 2. Subclass Two:  Persons Deemed Ineligible or Denied Services Without Notice and Opportunity for a Hearing

Plaintiffs offer Beverly W. as a representative of Subclass Two.  She is a forty-nine year old resident of Jefferson County and has been diagnosed with mental retardation, brain damage, and possible fetal alcohol syndrome.  Affidavit of Clarice W. (Doc. # 121-2 ¶ 5) (filed under seal pursuant to an Order of this Court (Doc. # 118)).  In 1992, and again in 1996, Clarice W., Beverly's mother, applied for residential and day habilitation services from the Jefferson County 310 Board.  (*Id.* ¶¶ 6-7.)  Between 1996 and 2004, Clarice received no communication regarding the status of Beverly's application or her place on the waiting list. (*Id.* ¶ 8.)

In 2005, Gary Hendrix of the Jefferson County 310 Board informed Clarice that Beverly was not eligible to receive services because she was found to be functioning above the range of mental retardation.  (*Id.* ¶ 10); (Doc. # 129-2 ¶ 29); (Doc. # 129-2, Ex. 1, at 15).  Clarice asked Hendrix to reconsider the decision.  (Doc. # 121-2 ¶ 11); (Doc. # 129-2, Ex. 2, at 16).  Hendrix told Clarice that she could provide additional documentation to assist in the reconsideration of the decision, and Clarice provided this documentation.  (*Id.*)

13

According to Beverly's supplemental response to Defendants' interrogatories, Beverly did not receive notice on how to object to being denied eligibility.  Supp. Response of Plaintiffs to Defendants' Interrogatories (Doc. # 173-23, DX D-9.)

On November 19, 2007, the Department informed the Jefferson County 310 Board that Beverly was ineligible because of her above-range IQ scores.  The 310 Board was responsible for informing Beverly of the decision and the procedure for appealing it.  Beverly and her family have not appealed the decision.  Aff. (Third) of Eranell McIntosh-Wilson (Doc. # 173-3 ¶¶ 21-22.)

### 3. Subclass Three: Persons Who Applied for Waiver Services and Did Not Receive a Reasonably Prompt Claims Determination

Plaintiffs offer Krystal W. as a representative of Subclass Three.  She is a twenty-five year old resident of Jefferson County and has been diagnosed with profound mental retardation.  Affidavit of Kathy W. (Doc. # 121-3 ¶ 3) (filed under seal pursuant to an Order of this Court (Doc. # 118)).  In 2000, Kathy W., Krystal's mother, applied for residential and day habilitation services.  (*Id.* ¶ 5.)  Between 2000 and 2003, Kathy made numerous phone calls to the agencies to determine Krystal's status on the waiting list, but she did not receive any updates.  (*Id.* ¶ 6.)  In 2003, Kathy withdrew the request for residential and day habilitation services because Krystal was receiving services through another waiver program that is not at issue in this case.  Aff. (Third) of Eranell McIntosh-Wilson (Doc. # 173-3 ¶ 25.)

In October 2005, Kathy reapplied for residential and day habilitation services because she believed that they were needed.  (*Id.* ¶ 26); ((Doc. # 121-3 ¶¶ 12-13).  On November 9,

14

2007, the regional office received Krystal's application for day habilitation services.  (Doc. # 173-3, ¶ 27.)

## IV. DISCUSSION

To obtain class certification, Named Plaintiffs must (1) have standing, (2) satisfy each requirement of Rule 23(a) of the Federal Rules of Civil Procedure, and (3) satisfy at least one of the requirements of Rule 23(b).  *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1321 (11th Cir. 2008).  The Plaintiffs have the burden of establishing the propriety of class certification. *Id.*

### A. Standing

Defendants argue Plaintiffs lack standing.  The Court must consider this issue before addressing the Rule 23 requirements.  *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987).  Defendants argue Plaintiffs lack standing because they are not entitled to the relief they seek and the statutes in issue do not create privately enforceable rights.  The Court finds that representatives of Subclasses One and Three have standing to assert claims under 42 U.S.C. § 1396a(a)(8) (reasonable promptness), the representative of Subclass Two has standing to assert claims under 42 U.S.C. § 1396a(a)(3) and the procedural protections of the Fourteenth Amendment, and no named plaintiffs have standing to assert claims under either 42 U.S.C. § 1396a(a)(10) (comparability) or the substantive protections of the Fourteenth Amendment.

### 1. Legal Framework

15

At the core of the Article III cases and controversies requirement is the rule that standing is limited to those who allege they personally have suffered or imminently will suffer an injury.  As the Supreme Court has explained, an injury sufficient to meet this requirement is "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  While the paradigmatic standing cases concern the latter clauses in this articulation, the standing dispute in this case turns on the existence of "a legally protected interest." *Id.*

"Standing may be based on an interest created by the Constitution or a statute," among other sources.  *Joint Anti-Fascist Refugee Comm.  v.  McGrath*, 341 U.S. 123, 152-153 (1951); *Primera Iglesia Bautista Hispana of Boca Raton, Inc.  v.  Broward County*, 450 F.3d 1295, 1304 (11th Cir.  2006) ("A legally cognizable injury requires infringement of an interest protected by statute or otherwise.").  That interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right.  *Id.*  Plaintiffs seek redress through § 1983 and assert violations of four "federal rights."

Section 1983 imposes liability on anyone who, acting under color of state law, deprives a person of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In *Maine v. Thiboutot*, 448 U.S. 1, 4-8 (1980), the Supreme Court held that § 1983 can be used to vindicate violations of federal statutory rights.  Somewhat more obviously, § 1983 can also be used to vindicate constitutional violations.  *Golden State*

16

*Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989) ("As the language of the statute plainly indicates, the remedy encompasses violations of federal statutory as well as constitutional rights.").  The Supreme Court has made clear that "[i]n order to seek redress through § 1983 . . . a plaintiff must assert the violation of a federal right, not merely a violation of federal law." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).

In the Third Amended Complaint, Plaintiffs allege that Defendants deprived, and are depriving, them of four federal rights guaranteed by the Medicaid statutes, 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)(B), 1396a(a)(3), and the substantive and procedural protections provided by the Fourteenth Amendment to the United States Constitution.

Because this is a motion to certify a class, the Court must "determine that at least one named class [or subclass] representative has Article III standing to raise each class subclaim." *Prado v. Bush*, 221 F.3d 1266, 1279-80 (11th Cir. 2000).  "[E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Id.* at 1280 (*quoting Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987)).  Therefore, the Court takes up each of the four claims and determines whether each named subclass representative has standing to prosecute the claims asserted by members of the subclass she seeks to represent. Making the standing determination requires two steps: (1) do Plaintiffs allege violations of federal rights remediable through § 1983 such that there is a "legally protected interest" sufficient to support standing, and (2) is at least one member of each subclass among the

17

injured with respect to the claims made by members of that subclass?

### 2. Count I: Deprivation of Rights Created by 42 U.S.C. § 1396a(a)(8)

Subclasses One and Three contain members who Defendants have allegedly subjected to violations of the reasonable promptness requirements of § 1396a(a)(8).[5]  The Court finds that Tara L., as a representative of Subclass One, has standing to assert a claim under 42 U.S.C. § 1396a(a)(8).[6]  The Court also finds that Krystal W., as representative of Subclass Three has standing to assert a claim under 42 U.S.C. § 1396a(a)(8).  As discussed above, in order to show they have standing to bring claims on behalf of their respective subclasses, Tara L.  and Krystal W. must show that they are personally suffering an injury to a "legally protected interest."  It is therefore essential to first set out in some detail the interests § 1396a(a)(8) protects.

### a. Federal Right

As discussed more fully above, the Medicaid Act requires states provide some services and permits them to provide other services.  The latter group is referred to as "optional services."  The HCB Waiver programs are optional services.  While it is true that

---

[5]Subclass One contains class members who have been determined eligible, but have not received services with reasonable promptness.  Subclass Three contains members who have applied for services, but have not received a reasonably prompt claims determination.

[6]In the Pretrial Conference, held in chambers on October 9, 2008, Plaintiffs indicated they intend to classify all eleven named plaintiffs as members of a particular subclass (or, in the case of at least one, as members of more than one subclass).  In their Motion for Class Certification, however, they offer one named plaintiff as a representative of each subclass.  Hence, eight named plaintiffs are unclassified as of the date of this Memorandum Opinion and Order.

the Waiver program is governed by an agreement between the state and the federal government, "when a state elects to provide an optional service, that service becomes part of the state Medicaid plan and is subject to the requirements of federal law."[7] *Doe v. Chiles*, 136 F.3d 709, 714 (11th Cir. 1998); *see also Boulet v. Cellucci*, 107 F. Supp. 2d 61, 76 (D. Mass. 2000) ("once a state opts to implement a waiver program and sets out eligibility requirements for that program, eligible individuals are entitled to those services and to the associated protections of the Medicaid Act"). Of particular relevance here is § 1396a(a)(8), which provides:

> [A state plan for medical assistance must] provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals.

This provision guarantees two categories of rights. First, that Medicaid assistance be furnished with reasonable promptness to all eligible individuals. Inherent in this guarantee is a second requirement that the agency make reasonably prompt claims determinations. In other words, "the standard for informing applicants of their eligibility for Medicaid services is 'reasonable promptness.'" *Doe v. Kidd*, 501 F.3d 348, 356 (4th Cir. 2007) (citing 42

---

[7]Defendants are correct to point out that 42 U.S.C. § 1396n(c)(3) permits a waiver of certain uniform requirements of the Medicaid Act. For example, under § 1396n(c)(3), a state may wave the statewidness, comparability, and income requirements of the Medicaid Act. This provision is the namesake of the waiver services at issue in this litigation. The statute does not, however, provide for waiver of the § 1396a(a)(8) reasonable promptness requirement. There is more on Alabama's waiver of comparability below.

C.F.R. § 435.911);[8] *Chiles*, 136 F.3d at 714;[9] *see also, e.g.*, *Boulet*, 107 F. Supp. 2d at 64

---

[8] 42 C.F.R. § 435.911 provides:

(a) The agency must establish time standards for determining eligibility and inform the applicant of what they are. These standards may not exceed--
  (1) Ninety days for applicants who apply for Medicaid on the basis of disability; and
  (2) Forty-five days for all other applicants.
(b) The time standards must cover the period from the date of application to the date the agency mails notice of its decision to the applicant.
(c) The agency must determine eligibility within the standards except in unusual circumstances, for example--
  (1) When the agency cannot reach a decision because the applicant or an examining physician delays or fails to take a required action, or
  (2) When there is an administrative or other emergency beyond the agency's control.
(d) The agency must document the reasons for delay in the applicant's case record.
(e) The agency must not use the time standards--
  (1) As a waiting period before determining eligibility; or
  (2) As a reason for denying eligibility (because it has not determined eligibility within the time standards).

[9] The Eleventh Circuit has recognized the duality of the reasonable promptness right created by § 1396a(a)(8):

Section 1396a(a)(8) reads: "A State plan for medical assistance must ... provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals. " A corresponding regulation provides that the responsible state agency "must," among other things, "[f]urnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures," and "[c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." Another regulation states that "[t]he agency must establish time standards for determining eligibility and inform the applicant of what they are." These periods are not to exceed "[n]inety days for applicants who apply for Medicaid on the basis of disability" or "[f]orty-five days for all other applicants. Moreover, the agency "must not use the time standards" as "a waiting period." It is this panel's task to determine whether the "reasonable promptness " clause of section 1396a(a)(8) "gives rise to a federal right."

*Chiles*, 136 F.3d at 714.

("Two regulations follow from [42 U.S.C. § 1396a(a)(8)]. 42 C.F.R. § 435.911 provides that a state agency 'must establish time standards for determining eligibility and inform the applicant of what they are. These standards may not exceed . . . [n]inety days for applicants who apply for Medicaid on the basis of disability.' [42 C.F.R. § 435.930] instructs, 'The agency must-(a) Furnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures . . . .").[10]  Subclasses One and Three contain members who allege violations of the first and second right, respectively.

The Eleventh Circuit has recognized a federal statutory right where Medicaid statutes require placement in an ICF/MR institution with reasonable promptness pursuant to the State's Medicaid Plan. *Chiles*, 136 F.3d at 719 (finding "a federal right to reasonably prompt provision of assistance under section 1396a(a)(8) of the Medicaid Act, and that [the] right is enforceable under section 1983"). Defendants argue that the reasonable promptness requirement of 42 U.S.C. § 1396a(a)(8) does not create privately enforceable rights here either because *Doe v. Chiles* has been called into question by the Supreme Court case of *Gonzaga University v. Doe*, 536 U.S. 273 (2002), or because *Doe v. Chiles* is

---

[10]With respect to furnishing services, the Medicaid regulations do not define "reasonable promptness" in terms of a specific time period. The regulations only state that the agency must "[f]urnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures." 42 C.F.R. § 435.930; *Doe v. Bush*, 162 F.3d 1037, 1062 n.20 (11th Cir. 2001). Courts considering the issue have found that "reasonable promptness" means within ninety days. *Chiles*, 136 F.3d at 715-19; *Boulet*, 107 F. Supp. 2d 61.

distinguishable from this case in any event.[11]

First, the Eleventh Circuit has not addressed the continuing validity of *Doe v. Chiles* following *Gonzaga*. However, no Circuit Court of Appeals has held, either before or after *Gonzaga*, that 42 U.S.C. § 1396a(a)(8) dos not create privately enforceable rights. The First, Third, Seventh, and Tenth Circuits have found or assumed a privately enforceable right after *Gonzaga*. *See Bryson v. Shumway*, 308 F.3d 79, 88-89 (1st Cir. 2002) ("[T]here is a § 1983 cause of action arising from the "reasonable promptness" provision of 42 U.S.C. § 1396a(a)(8) under the state model waiver plan as approved."); *Sabree v. Richman*, 367 F.3d 180, 192 (3d Cir. 2004) (42 U.S.C. § 1396a(a)(8) creates privately enforceable rights); *Doe v. Kidd*, 501 F.3d 348, 356 (7th Cir. 2007) ("Doe may proceed under § 1983 to address any failure by Appellees to comply with the reasonable promptness provision of the Medicaid Act."); *Mandy R. v. Owens*, 464 F.3d 1139, 1142 (10th Cir. 2006) ("[W]e assume that the individual plaintiffs may sue to enforce their rights under subsections (8) and (10)."). Courts have also held after *Gonzaga* that analogous and related provisions of the Medicare Act create privately enforceable rights. Among the provisions that create privately enforceable rights is § 1396a(a)(10), which the Eleventh Circuit has called "materially identical" to § 1396a(a)(8). *Bertrand v. Maram*, 495 F.3d 452, 456 (11th Cir. 2007) (§ 1396a(a)(10) is "materially identical" to § 1396a(a)(8)); *S.D. v. Hood*, 391 F.3d 581, 603 (5th Cir. 2004) (§

---

[11]The Court considered a version of this argument in August 2004. (Doc. # 8.) Because years have passed and the Courts of Appeal have decided numerous cases on point during those years, the Court has decided to reconsider the issue.

1396a(a)(10) creates privately enforceable rights); *Watson v. Weeks*, 436 F.3d 1152, 1159 &
n.8 (9th Cir. 2006) (42 U.S.C. § 1396a(a)(10) creates privately enforceable rights); *see also
Sabree*, 367 F.3d at 192 (42 U.S.C. §§ 1396a(a)(1), 1396d(a)(15), 1396a(a)(8) create
privately enforceable rights); *Ball v. Rodgers*, 492 F.3d 1094, 1107-11 (9th Cir. 2007) (42
U.S.C. §§ 1396n(c)(2)(C), 1396n(d)(2)(C) create privately enforceable rights). In light of the
unanimity of the Courts of Appeal on this issue, this Court finds that *Gonzaga* does not affect
the holding of *Doe v. Chiles* that 42 U.S.C. § 1396a(a)(8) creates privately enforceable federal
statutory rights.

Defendants also argue that the private right of action recognized in *Doe v. Chiles* is
inapplicable here because that case involved ICF/MR services and this case involves HCB
Waiver programs. (Doc. # 178 73) ("*Doe v. Chiles* . . . ,which concerned an entitlement to
ICF-MR, [and not HCB Waiver services,] is distinguishable and does not require a finding
of a private right of action . . ."). Defendants present a distinction without a difference.
While it is again true that the Eleventh Circuit has not addressed the specific issue of whether
42 U.S.C. § 1396a(a)(8) creates a private right of action when HCB waiver services are in
issue (rather than ICF/MR services), Courts of Appeal when considering 42 U.S.C. §
1396a(a)(8) have uniformly found a privately enforceable right irrespective of whether the
plaintiffs sought ICF/MR or HCB Waiver services. *See Chiles*, 136 F.3d at 719 (finding "a
federal right to reasonably prompt provision of assistance under section 1396a(a)(8) of the
Medicaid Act); *Mandy R,* 464 F.3d at 1142 (finding private right of action where plaintiffs

sought both ICF/MR and HCB Waiver services); *Kidd*, 501 F.3d at 356 (HCB Waiver services); *Sabree*, 367 F.3d at 192 (ICF/MR services); *see also Lewis*, 94 F. Supp. 2d at 1236 (HCB Waiver services); *Boulet*, 107 F. Supp. 2d at 72 (ICF/MR and HCB Waiver services); *cf. Cramer*, 33 F. Supp. 2d at 1350-51(finding a private right of action when eligible persons were denied a choice between ICF/MR and HCB Waiver services); *Watson*, 436 F.3d at 1159 & n.8 (finding private right of action under 42 U.S.C. § 1396(a)(10) when HCB Waiver services were at issue); *Ball*, 492 F.3d at 1107-11 (holding that 42 U.S.C. §§ 1396n(c)(2)(C), 1396n(d)(2)(C) create privately enforceable rights when HCB Waiver services were at issue). *But see M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1307 (D. Utah 2003) (42 U.S.C. § 1396a(a)(8) does not create a private right of action when HCB Waiver services were at issue). In light of the unanimity of the Courts of Appeal on this issue, and the vast weight of lower court and analogous authority, this Court finds that 42 U.S.C. § 1396a(a)(8) creates privately enforceable rights irrespective of whether the services in issue are ICF/MR or HCB Waiver services.

### b. Right-Holding Group

Having thus established the existence privately enforceable rights under this portion of the Medicaid Act, the Court turns to the second necessary inquiry: Whom does the Medicaid Act include in the right-holding groups?

### i. Provision of Services with Reasonable Promptness

Alabama has chosen to operate an HCB Waiver plan in the state. The waiver statute

provides eligible individuals in Alabama with an entitlement to waiver services and affords

them the protections of the Medicaid Act with respect to those services. *Chiles*, 136 F.3d at

714; *see also Boulet*, 107 F. Supp. 2d at 76; *Bryson*, 308 F.3d at 89 ("The strictures of §

1396a(a)(8) should apply with no less force to opt-in plans such as the waiver program. Once

the waiver plan is created and approved, it becomes part of the state plan and therefore subject

to federal law; the waiver plans must meet all requirements not expressly waived.").

Defendants argue that because of the existence of a legal cap on the number of eligible waiver

participants,[12] no one has a "right" to waiver sevices.  The Court agrees with the reasoning of

*Boulet v. Cellucci*, 107 F. Supp. 2d 61, 77 (D. Mass. 2000), which held that the cap on waiver

services is "simply a constraint on eligibility" and does not relieve Defendants of their

statutory obligations with respect to class members who would not exceed the cap.

"Individuals who apply after the cap has been reached are not eligible . . . . [T]he eligible

individuals under the cap are entitled to waiver services.  In short, the cap does not support

the defendants' position that the state has total discretion in providing waiver services."

*Boulet*, 107 F. Supp. 2d at 77-78; *see also  Lewis v.  N.M. Dep't of Health*, 275 F. Supp.  2d

1319, 1344 (D.N.M. 2003) (holding that "the reasonable promptness provision applies to

---

[12]*See* 42 U.S.C. § 1396n(c)(10) ("The Secretary shall not limit to fewer than 200 the number of individuals in the State who may receive home and community-based services under a waiver under this subsection."); 42 C.F.R. § 441.303(f)(6) ("The State must indicate the number of unduplicated beneficiaries to which it intends to provide waiver services in each year of its program. This number will constitute a limit on the size of the waiver program unless the State requests and the Secretary approves a greater number of waiver participants in a waiver amendment.)

waiver services once an individual is allocated an unduplicated recipient slot and the individual is eligible for the waiver services," but not when a person meets the preliminary eligibility requirements and a slot is not available).

Therefore, eligible persons, and by extension subclass members, are those who (1) meet the requirements for participation in the HCB Waiver programs, and (2) are entitled to one of the lawfully limited number of waiver slots that exist.  In other words, if a slot is not available, a person is not eligible, and so not a member of the subclass, even if that person otherwise meets the eligibility requirements.

### ii.  Reasonably Prompt Claims Determination

Defining the group of persons who are entitled to a reasonably prompt claims determination under § 1396a(a)(8) is less complicated.   "The standard for informing applicants of their eligibility for Medicaid services is 'reasonable promptness' and the relevant federal . . . regulations and manuals define reasonable promptness as forty-five days or ninety days, depending on the applicant."  *Kidd*, 501 F.3d at 356 (citing 42 C.F.R. § 435.911); *Chiles*, 136 F.3d at 709.  It is plain that all persons who apply for HCB Waiver services enjoy the protection of § 1396a(a)(8).  Applicants are entitled to have their claims determined with reasonable promptness.

### c.  Subclass One Representative

The record is not yet clear regarding the number of unfilled slots in the Alabama HCB Waiver program.   What is also not clear is whether Tara L.  is entitled to one of the existing

26

slots.  What is clear is that all members of Subclass One must prove they are entitled to one of the waiver slots, not only that they meet the requirements to be placed on the waiting list. The Court, however, is satisfied that Tara L.  is potentially a member of the right-holding group.  The Third Amended Complaint alleges that "[s]he needs and is qualified to receive services through a Medicaid Waiver, and is eligible for services that she is not receiving." (Doc. # 107 ¶ 11.)  Therefore, her claim presents a live controversy and "suffice[s] to pass the minimal test required for invoking the Court's jurisdiction." *Delta Coal Program v.  Libman*, 743 F.2d 852, 855 (11th Cir.  1984).

### d.  Subclass Three Representative

Krystal W., as named representative of Subclass Three, has personally suffered an alleged violation of § 1396a(a)(8).  As detailed above, in 2000 Krystal's mother applied for residential and day habilitation services.  Between 2000 and 2003 Krystal's mother made numerous phone calls to agencies in an attempt to determine Krystal's status on the waiting list, but she did not receive any updates.  She withdrew her request in 2003 but reapplied in October, 2005.  In November, 2007, the regional office received Krystal's application for day habilitation services.

This scenario states a violation of 42 U.S.C. § 1396a(a)(8), because "the standard for informing applicants of their eligibility for Medicaid services is "reasonable promptness" and the relevant federal . . . regulations and manuals define reasonable promptness as forty-five days or ninety days, depending on the applicant.  *Kidd*, 501 F.3d at 356 (citing 42 C.F.R. §

27

435.911.); *Chiles*, 136 F.3d at 709.  Here, years (2000–2003, 2000–2008) passed without any action on Krystal's claims for Medicaid assistance.  Under the Medicaid Act and its implementing regulations, persons who apply for services are entitled to a reasonably prompt claims determination.  Because this requirement was not met with respect to Krystal, she is a member of Subclass Three with standing to assert claims on behalf of the class.

### 3.  Count II: 42 U.S.C. § 1396a(a)(10)(B)

Plaintiffs' second count alleges that Defendants violated 42 U.S.C. § 1396a(a)(10)(B) by failing to provide comparable services to Waiver participants.[13]  As a general matter, when states provide assistance under Medicaid programs, benefits must be comparable among recipients.  *See* 42 U.S.C. § 1396a(a)(10)(B);[14] *see also Fisher v.  Oklahoma Health Care Auth.*, 335 F.3d 1175, 1186 n.12 (10th Cir. 2003).  However, states may waive the comparability requirement for programs such as the HCB Waiver programs at issue in this

---

[13] It is not entirely clear which subclasses implicate this count.  Subclass Two implicates only procedural claims and Subclass Three implicates only reasonably prompt claims determination.  Subclass One, on the other hand, contains members who "have received inadequate or inappropriate services."   This quoted language could encompass violations of the comparability requirements (if they were applicable), which mandate that services be alike in "amount, duration, [and] scope." 42 U.S.C. § 1396a(a)(10)(B).

[14] 42 U.S.C. § 1396a(a)(10)(B) provides:

that the medical assistance made available to any individual described in [this section]--

(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and

(ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in [this section].

case.  Section 42 U.S.C. § 1396n(c)(3) provides that

> A waiver granted under this subsection may include a waiver of the
> requirements of section 1396a(a)(1) of this title (relating to statewideness),
> section 1396a(a)(10)(B) of this title (relating to comparability), and section
> 1396a(a)(10)(C)(i)(III) of this title (relating to income and resource rules
> applicable in the community).

As is plainly permissible on the face of this statute, Alabama's HCB Waiver programs
include a waiver of the comparability requirement.[15]  As such, Alabama is not required to
provide comparable services across participants in the HCB Waiver programs.  In other
words, Plaintiffs enjoy no statutory right to comparable treatment in the context of the HCB
Waiver programs. Therefore, § 1396a(a)(10)(B) does not confer rights Plaintiffs can enforce
through § 1983.  As a consequence, the claimed violation of § 1983 cannot support standing.
Accordingly, Plaintiffs' Motion for Class Certification is due to be DENIED to the extent the
proposed subclasses allege violations of the comparability requirements.

### 4.  Count III: 42 U.S.C. § 1396a(a)(3) and the Fourteenth Amendment

#### a.  Federal Right

Proposed Subclass Two contains persons who Plaintiffs claim Defendants subjected
to violations of their procedural due process rights guaranteed by 42 U.S.C. § 1396a(a)(3) and
the due process clause of the Fourteenth Amendment.  State agencies must provide individuals
with an opportunity for a hearing before the agency when a claim for medical assistance is

---

[15] "With respect to the MR Waiver program and the LAH Waiver program, Alabama has
elected to waive the requirements of 42 U.S.C. § 1396a(a)(10)(B).  Thus, the comparability
requirement does not apply to Alabama's HCB Waiver programs." (Doc. # 178 Ex.  B ¶ 3.)

denied or is not acted upon with reasonable promptness.  42 U.S.C. § 1396a(a)(3);[16] 42 C.F.R.

§§ 431.206, 431.210;[17] *Cramer v. Chiles*, 33 F. Supp. 2d 1342, 1351-52 (S.D. Fla. 1999);

---

[16]42 U.S.C. § 1396a(a) provides:

A State plan for medical assistance must--

. . .

(3) provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness.

. . .

[17]The Court is aware that federal regulations do not of their own force create rights enforceable through § 1983 in this Circuit. *Harris v. James*, 127 F.3d 993, 1008-09 (11th Cir. 1997); *Kissimmee River Valley Sportsman Ass'n v. City of Lakeland*, 250 F.3d 1324, 1326-27 (11th Cir. 2001). However, where "a valid regulation merely further defines or fleshes out the content of [a] right, then the statute-'in conjunction with the regulation'- may create a federal right as further defined by the regulation" *Harris*, 127 F.3d at 1009. The Eleventh Circuit in *Harris* and *Kissimmee River* held that the regulations in issue went "beyond explicating the specific content of the statutory provision and impose[d] distinct obligations in order to further broad objectives underlying the statutory provision." *Kissimmee River*, 250 F.3d at 1326 (quoting *Harris*, 127 F.3d at 1009). In *Harris* the Court held that a regulation requiring transportation of Medicaid recipients was too far removed from statutory reasonable promptness and comparability requirements and created "distinct obligations." 127 F.3d at 1007-11.

Here, the relationship between the right-creating statute and the regulations is much different. The regulations cited here are contained in a particular subpart E of the Code of Federal Regulations titled "Fair Hearings for Applicants and Recipients." This Subpart "[i]mplements section 1902(a)(3) of the Act [codified as 42 U.S.C. 1396a(a)(3)], which requires that a State plan provide an opportunity for a fair hearing to any person whose claim for assistance is denied or not acted upon promptly." 42 C.F.R. § 431.200. The remainder of the Subpart fleshes out the meaning of "fair hearing." These regulations do not create "distinct obligations." Rather, they simply explain what it means to have a fair hearing under the Medicaid Act. The requirements are familiar to any student of American legal process: notice containing the reasons and basis for the opinion, a proceeding that meets the due process standards of *Goldberg v. Kelly*, a right to appeal an adverse decision, an impartial decision maker, access to evidence to be used against the recipient, et cetera. Congress intended to provide a "fair hearing." These regulations define that term and do not impose "distinct obligations." Therefore, they detail the federal right created by 42 U.S.C. § 1396a(a)(3) and remediable through § 1983.

The Court is also satisfied that 42 C.F.R. § 435.911, which sets a number of days a state

30

*Bryson v. Shumway*, 177 F. Supp. 2d 78, 81 (D.N.H. 2001). Additionally, State administration of Medicaid programs must meet the constitutional due process minimums set out in *Goldberg v. Kelly*, 397 U.S. 254, 267-71 (1970).[18]

The implementing regulations specify the content of the notice and the requirements for a fair hearing. The notice must inform the beneficiary of the action the agency intends to take and the reason for the action, of the facts and law that support the action, and of the right to a fair hearing. 42 C.F.R. § 431.210; *see also id.* § 431.206(b) (requiring agencies to inform every applicant or recipient in writing of the right to a hearing and the method by which one may obtain a hearing any time an individual applies for Medicaid or when an agency takes action affecting benefits).

These procedural protections are applicable to State's Medicaid Plans, which includes the HCB Waiver program. *See Chiles*, 136 F.3d at 714 ("when a state elects to provide an optional service, that service becomes part of the state Medicaid plan and is subject to the requirements of federal law."); *Parry v. Crawford*, 990 F. Supp. 1250, 1258-59 (D. Nev.

---

has to determine eligibility and is cited in various parts of this Opinion, is enforceable through § 1983 under *Harris*.

[18]*Goldberg* requires (1) "Timely and adequate notice," including notice of adverse evidence; (2) Opportunity to participate in the decision making; (3) "Effective opportunity to defend by confronting any adverse witnesses" and rebutting other information; (4) Representation by counsel; (5) A record of the proceedings and some form of reasons for the decision; and (6) An impartial decision-maker. 397 U.S. at 267-68. This constitutional guarantee is rendered redundant, however, by 42 C.F.R. § 431.205, which requires that a state's hearing system "meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970)." *See also Hernandez v. Medows*, 209 F.R.D. 665, 670 (S.D. Fla. 2002); *Hymons v. Williams*, 795 F. Supp. 1511, 1517 (M.D. Fla. 1992).

1998); *King v. Fallon*, 801 F. Supp. 925, 937-38 (D.R.I. 1992). Plaintiffs therefore have alleged a violation of a right remediable through § 1983, which, in turn, can support standing. So long as at least one named member of Subclass Two is among the injured, the standing requirements are met with respect to that subclass.

### b. Subclass Two Representative

Beverly W., as named representative of Subclass Two, has personally suffered an alleged violation of § 1396a(a)(3). As detailed above, in 1992 and 1996 Beverly W.'s mother applied for residential and day habilitation services. It was not until 2005 that Beverly's mother was informed that Beverly was not eligible to receive services because she was found to be functioning above the range of mental retardation.[19] Beverly's mother requested the 310 board reconsider the determination, but she did not receive notice regarding how to object to being denied eligibility.

This scenario clearly states a violation of 42 U.S.C. § 1396a(a)(3), which requires state plans "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." Moreover, the notice here did not inform the beneficiary of the action the agency intended to take, the reason for the action, of the facts and law that support the action, of the right to a fair hearing, and of the method by which one may obtain

---

[19] Beverly's mother received no communication regarding the status of the application or placement on the waiting list in the eight years following the 1996 application.

a hearing.  Sections 42 C.F.R. §§ 431.210, 431.206(b) require the agency to provide this information any time an individual applies for Medicaid or when an agency takes action affecting benefits.[20]  Because these requirements were not met with respect to Beverly W., she is a member of Subclass Two with standing to assert claims on behalf of the class.

### d.  Count IV: Fourteenth Amendment Substantive Due Process

Count IV of Plaintiffs' Third Amended Complaint alleges that Defendants violated the Constitutional rights of the putative class members by "fail[ing] or refus[ing] to remedy the known and continuing violation of plaintiffs' clearly established constitutional rights to habilitation, care, and treatment."[21]  (Doc. # 107 ¶ 144.)  The Court cannot locate, in caselaw or elsewhere, support for the proposition that there is a "clearly established constitutional right to habilitation, care, [or] treatment."  Because there is no substantive due process right that guarantees protection from the conduct Plaintiffs complain of, there is no alleged violation of § 1983, and that statute cannot support standing in this case.  Accordingly, Plaintiffs' Motion for Class Certification is DENIED to the extent the subclasses implicate alleged violations of substantive due process rights.

### B. Rule 23(a) Analysis

---

[20]The alleged violations also appear to violate the due process rights guaranteed by *Goldberg v.  Kelly*, 397 U.S. 254, 267-71 (1970), which apply as a matter both of constitutional law and by virtue of 42 C.F.R. § 431.205.

[21]Once again it is not clear which subclasses contain members whose substantive due process rights have allegedly been violated.  Perhaps all of them.  In any event, there is no such right.

One or more persons may sue as representatives of a class if the following four requirements are satisfied:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The court must take the allegations in support of the certification as true and refrain from conducting a preliminary assessment of the merits of the case. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). Each subclass must independently satisfy the Rule 23 requirements. *Johnson v. American Credit Co.*, 581 F.2d 526, 532 (5th Cir. 1978).[22]

**1. Numerosity**

The Court must examine the facts of each case to assess whether a putative class is sufficiently numerous. *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). Generally, however, classes of more than forty members satisfy the numerosity requirement. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); *Dujanovic v.*

---

[22]In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. Nov. 3, 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

*MortgageAmerica, Inc.*, 185 F.R.D. 660, 666 (N.D. Ala. 1999).  When the exact number of class members cannot be ascertained, the court may make "common sense assumptions" to support a finding of numerosity.  *Evans v. U.S. Pipe & Foundry*, 696 F.2d 925, 930 (11th Cir. 1983).

The primary focus of the numerosity requirement is whether joinder is impracticable. Thus, in cases involving mentally disabled plaintiffs, courts have found that the numerosity requirement is satisfied because joinder would be impracticable due to potential class members' disabilities, even where the class size is relatively small.  *Armstead v. Pingree*, 629 F. Supp. 273, 279 (M.D. Fla. 1986); *see D.W. v. Poundstone*, 165 F.R.D. 661, 670 (M.D. Ala. 1996); *Bradley v. Harrelson*, 151 F.R.D. 422, 426 (M.D. Ala. 1993).

**a. Subclass One:  Persons Who Have Not Received Waiver Services with Reasonable Promptness**

Plaintiffs argue that the numerosity requirement is easily satisfied because there were over 1,600 people on the waiting list as of August 2007.  (Doc. # 128-3, PX 1, at 3.) Defendants argue that the number of people on the waiting list does not establish numerosity because the list consists of persons who have different levels of need.  (Doc. # 129 39.)  The Parties' arguments are both slightly off the mark.

As discussed above, members of Subclass One are those who (1) meet the requirements for participation in the HCB Waiver programs, and (2) are entitled to one of the lawfully limited number of waiver slots.  In other words, if a slot is not available, a person is not eligible, and is therefore not a class member, even if a person otherwise meets the eligibility

requirements.

Plaintiffs have not provided the Court with sufficient information to make a determination regarding numerosity. It is not clear whether the Waiver programs are full.[23] There are neither allegations nor evidence that there are empty slots, aside from slots that are vacated in the middle of the fiscal year. The Court also lacks information about how many slots are vacated during the fiscal year. In short, if the Waiver programs are full, Plaintiffs' motion to certify Subclass One must be denied, because the class is a null set. If, on the other hand, there are a number available slots in the waiver program sufficient to meet the numerosity requirement, Plaintiffs' motion to certify Subclass One should be granted, provided that the other requirements of Rule 23 are met.[24]

While it is true that the Court could make common sense assumptions to estimate the size of the putative subclass, Plaintiffs have not provided even enough information for the

---

[23]In his July 2007 affidavit, Fordyce Mitchell (Doc. # 105 Ex.1 ¶ 30) states: "The Department requested in April 2007, and has now been approved, to serve an additional 60 individuals, bringing the total available 'slots' to 5620. Current enrollment in the MR Waiver program is approximately 5154 and *the Department is in the process of filling the additional slots.*" (emphasis added). The Court cannot determine from this limited information the size of this putative subclass.

[24]The Court notes that the expected gross disparity between the number of available Waiver slots and the number of persons on the waiting list (many of whom are in competition for those slots) causes this subclass to fail on adequacy grounds. When considering whether a putative class satisfies the adequacy requirement of Rule 23(a)(4), a court should consider "whether any substantial conflicts of interest exist between the representatives and the class." *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). Named Plaintiffs would be in direct competition with absent class members for whatever few Waiver slots are available. The Court finds, therefore, a "substantial conflict of interest . . . between [Tara L.] and the class." *Id.* Subclass One therefore, lacks both numerosity and adequacy.

Court to guess if the subclass members are too numerous to join.  Therefore, Plaintiffs Motion to Certify Class is due to be DENIED with respect to Subclass One.

### b. Subclass Two:  Persons Deemed Ineligible or Denied Waiver Services Without Notice and Opportunity for a Hearing

As of August 2007, approximately 1,681 persons were on the waiting list.  Since July 1, 2000, at least 2,700 persons have submitted applications for services, including person deemed ineligible.  A common sense assumption is that many applicants were denied because they were deemed ineligible for the services that they sought.  There is evidence that Defendants did not offer Beverly W.  and other named plaintiffs notice of how to object to the decision denying her eligibility.  Moreover, numerosity would be satisfied in this subclass because of the impracticability of joining unknown applicants who likely are mentally retarded. Thus, Subclass Two satisfies the numerosity requirement.

### c. Subclass Three: Persons Who Applied for Waiver Services and Did Not Receive a Reasonably Prompt Claims Determination

To establish numerosity for this subclass, Plaintiffs point out that many of the named plaintiffs waited years to receive an eligibility decision.  For instance, Kathy W., mother of Plaintiff Krystal W., testified that Krystal waited two years for her first claim determination.

The Department has received at least 2,700 applications in this decade, but it is not clear how many persons, other than some named plaintiffs, did not receive a reasonably prompt claim determination.  A common sense assumption is that numerosity is satisfied for this subclass because of the number of potential applicants who have not received reasonably

prompt claims determinations and the fact that some named plaintiffs waited years for decisions.  As is the case with Subclass Two, the numerosity would be satisfied in this subclass because of the impracticability of joining unknown applicants who likely are mentally retarded.  Thus, Subclass Three satisfies the numerosity requirement.

### 2. Typicality and Commonality

The typicality requirement measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large.  *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1322 (11th Cir. 2008).  All putative class members are not required to have identical claims, and factual differences among the claims of the putative class members do not defeat certification.  *Cooper v. Southern Co.*, 390 F.3d 695, 714 (11th Cir. 2004). However, Named Plaintiffs' claims must still share the same essential characteristics as the claims of the class at large.  *Id.*

The commonality analysis is similar to the typicality analysis because it "measures the extent to which all members of a putative class have similar claims."  *Id.* at 714.  The difference is that commonality refers to the group characteristics of the class as a whole, whereas typicality refers to the individual characteristics of the named plaintiff in relation to the class.  *Id.*  Under the commonality requirement, the class action must involve issues that are susceptible to class-wide proof.  *Id.*  Moreover, the commonality requirement does not mandate that all putative class members share identical claims, and factual differences among the claims of the putative class members do not defeat certification.  *Id.*  The parties addressed

commonality and typicality together in their briefs, and the Court will do the same in this subsection. The Court finds that Subclasses Two and Three easily meet the typicality and commonality requirements.

Plaintiffs argue that the typicality and commonality requirements are satisfied for each of the three subclasses for the following reasons:[25]

> All are adults with some degree of mental retardation. All have been determined by the defendants to be eligible for Alabama's [waiver] services. More than one thousand proposed class members receive no services that they need and for which they are eligible, and hundreds of additional class members are not receiving adequate services for which they are eligible. As a result of their being denied appropriate services, in whole or in part, the named plaintiffs and the proposed class both charge the defendants with the same violations of federal law, and they both seek the same injunctive relief.

(Doc. # 128-2, at 14.)

Defendants argue that the typicality and commonality requirements are not satisfied for three reasons. First, Defendants argue that Plaintiffs lack standing to bring claims in this action. That argument was considered above.

Second, Defendants point out that nine of the fourteen named plaintiffs, including the three named plaintiffs who represent the subclasses, all reside in Jefferson County and are clients of the Jefferson County 310 Board. Defendants suggest that certification of a statewide class may be inappropriate because the Jefferson County 310 Board may be doing a particularly bad job of serving people. This argument overlooks the fact that the it is the

---

[25]The Court will not consider whether Subclass One, which has not been shown to meet the numerosity and adequacy requirements, meets the commonality, typicality, or Rule 23(b)(2) requirements.

State's Medicaid plan that is required to comply with Federal Law. With respect to Subclass

Two, it is "State plan[s] for medical assistance" that must provide individuals with notice and

an opportunity for a hearing. 42 U.S.C. 1396a(a)(3); *see also, e.g.*, 42 C.F.R. §§ 431.206,

431.210. With respect to Subclass Three, 42 U.S.C. § 1396a(a)(8) applies to "State plan[s]

for medical assistance," which must provide assistance with reasonable promptness.

Furthermore, it is states that must "establish time standards for determining eligibility." 42

C.F.R. § 435.911.

Third, Defendants argue that commonality and typicality are not satisfied "because all

of the issues presented by each class require an extensive analysis of each class members's

individual claims before any resolution can be achieved." (Doc. # 129-1 46.) Defendants

point out that the potential class members have a variety of abilities and needs. Despite these

factual differences, certification is appropriate because Plaintiffs in Subclass Two seek to

force the State to provide the notice and opportunity for a hearing to *all* applicants who are

denied eligibility, including all class members. Likewise, members of Subclass Three seek

to force the State to provide reasonably prompt determination of the eligibility of *all*

applicants, including all class members. What Plaintffs challenge are the "general policies,

practices, and procedures of the Defendants." (Doc. # 128 10.) In other words, "[t]he issue

is . . . defendants' compliance with federal law." (Doc. # 128 11.) As a consequence, it does

not appear that class members would have to offer additional proof on their individual claims

to obtain the relief they seek. Therefore, having considered the claims, defenses, facts,

substantive law, and the degree to which resolution of the classwide issues will further each class member's claim, it is the determination of the Court that Subclasses Two and Three satisfy the commonality requirement.

Finally, the Court finds that Beverly W.'s claims are typical of Subclass Two and Krystal W.'s claims are typical of Subclass Three.  As detailed above Beverly W.'s mother applied for residential and day habilitation services in 1992 and 1996.  It was not until 2005 that Beverly's mother was informed that Beverly was not eligible to receive services because she was found to be functioning above the range of mental retardation.  Beverly's mother did not receive notice regarding how to object to being denied eligibility or assert her right to a hearing.  Moreover, the notice she did receive did not inform her of the action the agency intended to take, the reason for the action, of the facts and law that supported the action, of the right to a fair hearing, and of the method by which one may obtain a hearing as required.  There are no material differences between Beverly's claim and the claims of the other subclass members.  Therefore, Beverly's claim is typical—is the very definition of—the claims of members of Subclass Two.

With respect to Subclass Three, in 2000 Krystal's mother applied for residential and day habilitation services.  Krystal's mother made numerous phone calls between 2000 and 2003 in an attempt to determine Krystal's status on the waiting list, but she did not receive any updates.  Years (2000–2003, 2000–2008) passed without any action on Krystal's claims.  There are no material differences between Krystal's claim and the claims of the other subclass

members.  Therefore, Krystal W.'s claim is manifestly typical of the subclass of persons who have applied for services and not received a reasonably prompt claims determination.

### 3. Adequacy of Representation

The adequacy requirement encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action.  *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008).

### a. There is no Substantial Conflict Between Named Plaintiffs and Absent Class Members

A substantial conflict occurs when "some party members claim to have been harmed by the same conduct that benefitted other members of the class."  *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).  Plaintiffs argue that Named Plaintiffs' interests are not antagonistic to the those of the class.

Defendants argue that a substantial conflict exists between Named Plaintiffs and absent class members because there are a limited number of slots in the waiver programs, and thus class members are essentially competing for those slots.  If the cap remains fixed and some Plaintiffs are given relief, then other persons who are receiving services would be bumped out of the programs.  This argument may well have presented a problem for certification of proposed Subclass One, but the Court decided not to certify that subclass for other reasons.[26]

---

[26]The Court did note above, however, that the expected gross disparity between the number of available Waiver slots and the number of persons on the waiting list (many of whom are in competition for those slots) would cause this subclass to fail on adequacy grounds.

There are no substantial conflicts between the subclass representatives of Subclasses Two and Three and their respective subclass members.  As for Subclass Two, Beverly W.'s claim for adequate notice and an opportunity for a hearing will not place her in a position adverse to the other members of Subclass Two.  Likewise, Krystal W.'s claim for a reasonably prompt claim determination will not place her in a position adverse to other members of Subclass Three.

### b. The Representatives Will Adequately Prosecute the Action

Rule 23(a)(4) states that the representative parties must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy requirement applies to both the named representatives and counsel.  *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003).  The Court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).  A conflict will defeat class certification only if it is "fundamental" with respect to the specific issues in controversy.  *Valley Drug Co. v. Geneva Pharms.*, 350 F.3d 1181 (11th Cir. 2003).  After the present Motion came under submission, Defendants filed a Motion for Leave to File Newly Discovered Evidence (Doc. # 190), which was granted.

The new evidence is minutes from meetings of the board of directors of the Jefferson County 310 Board.  The minutes show that Bob Kracke, an attorney for Plaintiffs, has been a director since before this case was initiated in 2000.  In a 1999 meeting, Kracke informed

the other directors that the Arc of Jefferson County, a service provider that receives grants from the Department, intended to file this lawsuit. The directors voted to join the lawsuit and fund one-half of the legal expenses (Kracke abstained from this vote). Kracke routinely updated the other directors about this case. In 2004, the directors of the Jefferson County 310 Board voted to no longer pursue this case. The directors continued to receive updates on the litigation.

Defendants argue that Named Plaintiffs and their counsel are not capable of providing adequate representation under Rule 23 because of this alleged conflict: The Jefferson County 310 Board helped to initiate this litigation and one of its directors is class counsel, but the 310 Board also serves as a link between the Department and many of the named plaintiffs and putative class members. Defendants suggest that Plaintiffs may have waived claims against the 310 Board that the putative class might have otherwise sought to pursue.

In the Court's view, the role of the Jefferson County 310 Board is not the fundamental issue in this case. The 310 Board is an advocacy organization that works on behalf of putative class members. The fact that the 310 Board contracts with the Department to manage the provision of services in Jefferson County does not create a fundamental conflict. Plaintiffs' claims focus on the Department, which has a more fundamental role in determining whether services are provided and eligibility is determined in accordance with the requirements of the Medicaid Act. Section 42 U.S.C. § 1396a(a)(8) applies to "State plan[s] for medical assistance," which must provide assistance with reasonable promptness. Likewise, it is "State

plan[s] for medical assistance" that must provide individuals with notice and an opportunity for a hearing.  42 U.S.C. 1396a(a)(3); *see also e.g.*,  42 C.F.R. §§ 431.206, 431.210. Furthermore, it is states that must "establish time standards for determining eligibility." 42 C.F.R. § 435.911.  Plaintiffs claims are clearly directed at, and based upon, the actions of the Department of Mental Health and Mental Retardation, an agency of the State.

For these reasons, Named Plaintiffs and their counsel satisfy the adequacy of representation requirement.

### C. Rule 23(b)(2) Analysis

In addition to satisfying the prerequisites under Rule 23(a), a potential class must also satisfy one of the requirements listed in Rule 23(b).  Rule 23(b)(2), the provision applicable to this case, requires that defendants have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2). While certification under this rule does not preclude money damages, the plaintiffs must be primarily seeking injunctive or declaratory relief for certification under this rule to be proper.  *Taylor v. Flagstar Bank*, 181 F.R.D. 509, 518 (M.D. Ala. 1998).  In this case, Plaintiffs seek relief that is purely equitable in nature.

Plaintiffs argue that Defendants have acted in a manner generally applicable to the class "[b]y placing the named plaintiffs and many of the proposed class members on a waiting list for many years."  (Doc. # 128-2 22.)  Defendants disagree and argue that

> [t]he decisions made with respect to putative class members' eligibility and placement on the waiting list, and what services are in fact appropriate for a putative class member, involve decisions and input from the Division, regional offices, numerous 310 Boards, providers, and (in some cases) the putative class member's guardian. It is a fluid process, and necessarily so, as the Division seeks to serve those with the most critical needs and in the most beneficial way.

(Doc. # 129-1 52). Defendants analogize this case to *Rhodes v. Cracker Barrel Old Country Store, Inc.*, in which the plaintiffs challenged "thousands" of hiring decisions "made by numerous local decision-makers over six years" and in many different locations. 213 F.R.D. 619, 683 (N.D. Ga. 2003). All of this concerns Subclass One. Again, the Court has declined to certify that subclass.

With respect to Subclasses Two and Three, it is clear that Plaintiffs claim their rights were violated because the Department acted or refused to act on grounds generally applicable to the class. Likewise, the injunctive and declaratory relief Plaintiffs seek will apply to the class as a whole. With respect to Subclass Two, Plaintiffs claim it was the practice of the Department to not provide statutorily adequate notice and an opportunity for a hearing. Their claimed injuries result from this alleged practice, as applied to all members of the subclass. With respect to Subclass Three, Plaintiffs claim it was the practice of the Department to not provide reasonably prompt claims determinations. The claimed injuries of the members of the subclass result from this alleged practice, as applied to all members of the subclass. Thus, Defendants have acted in a manner generally applicable to both Subclasses Two and Three.

## V. CONCLUSION

The Plaintiffs have shown that the Court should certify Subclasses Two and Three. Accordingly, it is hereby

ORDERED that the Amended Motion for Class Certification (Doc. # 128) is GRANTED in part and DENIED in part. The Motion is GRANTED with respect to Subclass Two and Subclass Three. The Motion is DENIED with respect to Subclass One and to the extent members of any subclass sought to bring claims under Counts II and IV.

It is further ORDERED that absent class members need not be given notice and an opportunity to opt out of this action.

Done this the 24th day of October, 2008.

/s/ Mark E. Fuller
_____
CHIEF UNITED STATES DISTRICT JUDGE
